This case brought back memories of my days in the DA's office. I remember those requests for proposals and bid protests. It's a complicated area. It is. Good morning, Your Honors. May it please the Court, my name is Michael Brunette from the law firm of Karen Cross and Happelman. I'm here representing the plaintiff, J.M. Martinac Shipbuilding Corporation. If I may, I'd like to reserve five minutes for rebuttal. All right. The time you have on the clock is your entire time, so when it counts down to five... I'll stop. Okay. Thank you, Your Honor. Martinac is seeking compensation here for its good-faith participation in what it believed was a public bidding process, without knowing that the Department of Transportation, DOT, would undermine all efforts, including Martinac's, to replace the aging steel ferries. But for Martinac's efforts in bringing the unsafe condition of the ferries to the legislature's attention, they may still be on Washington's waters today. But rather than being rewarded for its efforts, Martinac was damaged to the tune of millions of dollars by the defendants. Well, isn't your biggest problem here the peerless line of cases? Your Honor... You're trying to recover for the expenses of making a bid that wasn't accepted, as far as I can make out. Your Honor, the peerless line, I think, is the central issue in this case. However, for a number of reasons, the peerless line of cases does not apply here. For one, Martinac is not a disappointed bidder. The peerless line was based upon the public interest, the public purse, which is simply not implicated here. There was no contract ever awarded under the House bill that led to the bid procurement. You're saying you got more rights because you didn't have a contract than you would have if you had a contract, is that... Well, Your Honor, if we had entered a bid under Substitute House Bill 1680, which is the procurement for the first 130-car ferries, then there might be an argument that we would be benefited if a contract was awarded. But here, there were no ferries built or any contract even awarded under Substitute House Bill 1680. Isn't that the same thing? If you're saying that the state of Washington thwarted the efforts to have a contract let, isn't that the same argument, just kind of a different twist? Our argument is less that a contract was not awarded and more that there was fraudulent and bad faith conduct by the defendants during the bid process. To what end? To the end that they led Martinac to spend millions of dollars in designing ferries that the... And no contract was left. Well, that the defendants would never, never intended to actually have a contract. But, I mean, if you decide to spend money and you don't have a contract, what authority do you have to say you can, you know, recover on a hope and a prayer? Well, the state through both legislation, direct express assurances to Martinac, and the RFP itself led Martinac to believe that there would be procurement of 130-car ferries. For example, the state in October of 2003 announced its intention to build 130-car ferries. It issued an RFP just a few months later for that same size. A year after that, it issued a report to the Transportation Commission that the 130-car ferries were the optimal size ferries for the Washington State Ferry System. And then in February of 2005, it went so far as to spend $40-plus million purchasing four complete propulsion systems that were fitted specifically for 130-car ferries. So how did that, but how all of that, how would that have ever entitled you to have the contract? It did not entitle Martinac to have the contract, but it led to an expectation of 130, that there would be procurement of 130-car ferries. And Martinac expended significant amounts of money in its design for that size. Well, but let's say they had stayed with that and you didn't get the contract. Then would you be able to complain? Given the bad faith and fraudulent actions, I believe so. Is there any authority for the fact that you claim it was bad faith and fraud and so forth? Does that change the peerless analysis? The Mottner case, Washington Supreme Court case,  there is the possibility of bid recovery damages. Yes. The case was not decided in favor of the bidder in that case, but they did note that that could happen. Okay. So you have to show extreme bad faith or fraud. What is the extreme bad faith or fraud in this case, specifically that would entitle you to either the Mottner relief? That would be the, it's briefed very well in Martinac's 51-page complaint, but it would be the Department of Transportation's disparagement of Martinac, its untrue statements made in the basis of the bid process, its continuing representations to Martinac that it was going to be procuring 130 car ferries when, in fact, it knew because of the safe harbor leases that it wasn't going to be replacing the steel electric ferries unless it was required to do so. I think that's the general gist. So that's your, so you had RICO claims, right? We had RICO claims. And you had defamation? Defamation, fraud claims. And conspiracy. And intentional interference as well, Your Honor, tortious interference. And did you have negligence? We had a negligence claim, yes, thank you. And all nine of those claims were dismissed at the 12B6 stage before Martinac could do even the most basic discovery. So we have what's in the complaint, Your Honors, but we haven't had any chance to do discovery in this case to further find out what the bases for our fraud claims are. Well, tell me about the defamation claims. What did the district court rule? The district court in the defamation claims ruled that they were barred by the statute of limitations, at least some of them, because statements were made in 2003, 2004, and then into the bidding process. We argue that the defamation claims should not have been barred by the statute of limitations because they should have been equitably told here. And the court didn't agree with you on that? The court did not agree with us on that. All right. And so if you lose on that issue, there's only one statement that I had a question about. There were statements made by, well, there were two statements made by Lorenz Ziedweg. I'm not exactly sure of the pronunciation of his name, yes. And that those statements seem to be communicating ideas or opinions, and there would be no way that they could support a defamation claim. Your Honor, we would argue that those statements by Mr. Ziedweg were opinions with factual bases underpinning them. He also made a number of statements that implied a Martin Act was not qualified to bid in this process, and the Moore case established defamation by implication in this state where communication, if it leaves a false impression, that could be rectified by inclusion of omitted facts, then it can be defamation. And here, Mr. Ziedweg's letter and omissions of fact about the lack of qualifications certainly would fall under that particular doctrine. What about the district court's determination that the author of the letter that said your client didn't meet the requirements was not named as a defendant? Does that bar your claim? That's actually a different letter, Your Honor. That's a letter by Mr. McDonald. And we would argue that since it came out of Mr. — Yes, but that was not Mr. Ziedweg's letter. Well, McDonald is absolutely immune, isn't he? Mr. McDonald was a senior executive, and if his statements were otherwise privileged, then yes, he would be allowed to have the immunity. We would argue that his statements were not privileged because they're not sufficiently related to his official duties. For example, Mr. McDonald's statement at a lunch meeting regarding Martinac's qualifications and Mr. McDonald's statement after he left a meeting that all he wanted to do was slam Martinac, and so he's happy that he did that, don't appear to be related to his official duties at all. Even though Martinac is trying to get him to approve their specs for the new ferry boats? Your Honor, I would argue that the line has to be drawn somewhere. Certainly, if someone is an official, if they're doing official business, they should be allowed to speak about people involved in that business. But at a lunch meeting and that kind of statement coming out of a non-official meeting, we would argue is just too far, it's too attenuated. Another issue about the peerless cases is that they were generally related to minor irregularities. Before you leave the defamation, you're claiming that this is on the statute of limitations. You're claiming that they didn't apply. What's your argument on that? Equitable tolling, Your Honor. Equitable tolling. Why is it equitable tolling? Why isn't it a matter of discovery? The discovery rule? I think, to me, it's closer to discovery than it is to equitable tolling. It definitely could be, Your Honor, because the basis is that you're claiming these statements were made in private meetings or semi-private meetings or something, and your client didn't know anything about them for some years after they were made. That's a discovery problem, isn't it? That's not an equitable tolling problem. Your Honor, the discovery rule could apply there as well because we're arguing that because of the defendant's bad faith, we were not able to find out about these issues until we were preparing our complaint in late 2006. So, yes, the discovery rule could apply as well. Your Honors, I note that I'm close to my time. Right. Didn't the district court leave open the option of your going back to state court? In terms of the supplemental jurisdiction issue on the fraud claim? Yes. It did, Your Honors. We decided to appeal because we considered the other claims. There was error and dismissal of the other claims here, and we wanted to have that resolved. All right. Thank you, Your Honors. Good morning, Your Honor. Steve Puz, Assistant Attorney General. I represent the defendant appellants in this case. Your Honor, we're here today because Martinack is irritated because the very eventuality that was contemplated by the Ferry Procurement Statute substitute House Bill 1680 occurred. DOT changed the size of the ferries, something that the statute RCW 47.60.818 specifically allows DOT to do. In 1999, the legislature included a provision in engrossed House Bill 1125 that appropriated $1.5 million to study new auto ferry designs. Martinack contends in its complaint that it relied on that specific provision to embark on a business strategy of designing its 130-car ferry with Z propulsion system. Counsel, what's really going on here? Is Martinack a thorn in the Department of Transportation's side? Is there bad blood? What's really going on? I don't think so, Your Honor. What really is going on here is this. Martinack built or designed a 130-car ferry before anybody asked it to do so, before DOT ever advertised bids for a ferry, before the Ferry Procurement Statute was even enacted, based on a provision in 1125 that was vetoed by the governor. Now, when that ferry, when DOT later determined that it was going to build 144-car ferries instead of the 130-car ferry that Martinack designed, it realized that its business risk was failing. And so it did two things. It brought a state court lawsuit trying to force DOT to build its 130-car design, and contemporaneous with that, it brought this lawsuit, asking the public to underwrite the risk it took incurring bid preparation costs or designing a ferry two years before the ferry statute came into being. Well, if they had stuck with the 130 and what Martinack had done, would they have been in a better position to get the contract by virtue of the fact that they would have been ahead of other people? Well, absolutely not, Judge. And it brings me up to my first point. These issues were all moved. I mean, what happened is the legislature came in 2007 and enacted Substitute House Bill 2378, which completely eliminated the 1680 ferry procurement. So regardless of any actions that the state did or didn't take here, neither Martinack nor any other shipbuilder that was participating in that ferry procurement could ever be awarded a contract to build 130-car ferries or anything else. Now, what's the present state of affairs? The present state of affairs, Your Honor, is that 2378 was enacted. Martinack, along with other shipbuilders, formed a consortium and submitted a notice of intent to submit a single joint proposal to construct the 144-car ferries called for in 2378. That was accepted by Washington State Ferries, and that matter is pending right now. Has that been accepted yet? There hasn't been a final contract or funding by the legislature on that. So the old ferries are still in use? No, Your Honor, the ferries are not in use. And it doesn't mean that there's not going to be any other. It doesn't mean that DOT isn't going to be awarding contracts to build other ferries. There may be other size ferries that DOT is proceeding to build. It just means with respect to this 1680 procurement, that ended with the enactment of 2378. Now, Martinack concedes that point. So the issues of the issue. So let me just, just so I understand the contents here. So the ferries that were to be replaced, are they still in use or not? No, Your Honor. And so what is in use? There are no ferries operating? There are other ferries in use that are operating on those ferries. But they weren't built new? No, Your Honor. Okay. So the first argument, of course, is that the claim is moot. I just want to bring the court's attention to the damages that they're actually asking for in this case, and it's found at paragraph 100 of their complaint. They allege that their costs and expenditures were, quote, rendered unnecessary and superfluous to design-build procurement process as a direct and unavoidable consequence of DOT's unilateral decisions and actions during the procurement process to modify the design-build process contrary to the SHB 1680 mandate. Did the state court say that the Department of Transportation had complete authority to change the bid statute? But, of course, it did. And it's that statute that I cited to you. They had complete and total authority under 1680 to change the size. Moreover, the damages that they seek under 1680 they could never get because, again, it's mooted out by the fact that 2378 was passed. Even if they weren't mooted out, or maybe in addition to the fact that they're mooted out, Martinak has collaterally stopped from re-litigating the issues that it already lost in its state court action to support the claims that it raises here. Let me ask you about the defamation claim. Based on your knowledge of this case, what would be the genesis of a statement that, I think it was Mr. McDonnell, got a chance to stick it to Martinak? Slam. Who was it? Slam. To slam or whatever the term. What would be the genesis of that, and why wouldn't that be defamation? Well, first of all, there isn't actually a statement alleged or connected with that particular paragraph. In order to show defamation, you have to show a false statement that's not privileged. As this court is well aware, unflattering statements to an individual or company, while they may slam them, doesn't mean that they're defamatory. In order to prove defamation, you have to show that the statement was false and that it was not privileged. Now, in this particular case, they chose not to actually allege any statement made by Secretary McDonnell at that meeting. Moreover, that meeting, by definition, was made during the course of a statement on the gas tax issue, which fell directly into the funding of DOT and directly pertained to the subject matter of the Secretary of the Department of Transportation. Well, let me ask you. Judge Cudahy has sort of raised this on the discovery, on whether the discovery rule should apply. Why shouldn't we remand Martinac's defamation claims to the district court for fact-finding on whether the discovery rule should apply, i.e., when Martinac should have known of the allegedly defamatory statements made by state officials? Because it would appear that they're, you know, I mean, if they're privileged or, you know, why isn't this a discovery rule problem? Because it is a 12b-6. Well, first of all, because it doesn't matter. They are beyond the statute of limitations. They haven't alleged anything that would show that they didn't discover these until within two years of filing of their lawsuit. But irrespective of that, but it doesn't matter because all of the, as Judge Cudahy pointed out, these are all privileged. As a matter of law, that's a determination for the court to make. That isn't a fact-finding determination. Well, but not on the 12b-6. Absolutely. You don't make factual findings on the 12b-6. That's right. But with respect to whether the privilege attaches, you absolutely do make that decision on, it's a question of law for the court to decide. And in this particular case, the court is, what's before the court are the statements and the two questions or two issues that the court must decide and which demonstrate that the privilege attaches here are whether or not Secretary McDonald was a high-ranking government official. Martinet concedes they were. And the second is whether those statements were made with the subject of those statements fell within his official duties. And, of course, they did. He's the chief executive officer of the Department of Transportation. He is required to say What were the statements? What statements do you, are you referencing at this point? Every single statement that they're alleging and attributing to the Secretary McDonald concerned the 1680 process and the proposals that Martinet submitted, every single one of them. By law, 1680 and that procurement. What are the damages allegedly attributable to this alleged defamation? Your Honor, they don't specify what the damages were. They claim, I think rather vaguely, just a damage to reputation without any more specificity. If Mr. McDonald was in a bar talking and he said Martinet was never qualified, they're a bunch of crooks, that would be privileged. If he's in a bar after hours, anything he says that relates to the bid by Martinet is privileged just because he said it and because of his position. Is that your argument? It's not anything that he says about Martinet, Your Honor. It's anything that he says that falls within the subject matter of his official duties and in the scope of his official duties. Regardless of when and where he says it. That's right, because part of the responsible, and that was the exact point of the gold chichilla cases and some of the other cases that were cited. The point of the matter is that government officials are required to get out and inform the public of events that are important to them. And part of that, and in fact, statutorily, what Secretary McDonald What better place than a bar? Well, I guess reasonable minds could argue on that point, Your Honor, but that, of course, isn't before us. What we're talking about are statements made to the legislature, statements made to the Transportation Commission, and of course, all of those statements fall within the privilege. That is, in fact, by statute, part of Secretary McDonald's Your opponent was talking about a luncheon. Let's talk about a luncheon. The luncheon is the one that, well, I guess there were a couple of different luncheons that were mentioned. One of them was a luncheon with specific legislators where he was talking about the 1680 procurement process. Obviously, that falls within the scope of the privilege. It's not so obvious. Your Honor, with due respect, I mean, he is a high-ranking official, and it's the subject matter of the statements that are being made. It all falls within the subject matter of his responsibilities as Secretary of the Department of Transportation on the very statute upon which he is entrusted, and it's to the legislatures which he, as a matter of law, is required to keep apprised of those matters that fall under his jurisdiction. I think that all of the elements are met there. What under the law says he has to keep the legislators apprised? What says that? Your Honor, I cited it in my brief. There's a specific statute, 4760-001 sub 9 and 10, I think, are it. What it says is part of the Secretary of Transportation's duties are to keep and advise the legislature and the Transportation Commission apprised of those matters within the Secretary's jurisdiction. In this particular case, the ferry system is specifically designated by statute under the control and jurisdiction of the Department of Transportation. Moreover, 1680, as a matter of law, specifically vests responsibility for this matter into the Department of Transportation, which the Secretary of Transportation is the chief executive of. I mean, these all fall expressly within his express jurisdiction, his statutory jurisdiction. So is your argument that as long as the Secretary of Transportation is talking about matters that are germane to his responsibility as a matter of law, he cannot defame? Is that your argument? The law is, in this area, Your Honor, that so long as he falls within the area of high-ranking official, which Martinet concedes, and the subject of his statements fall within the scope of his official duties, and the subject falls within the scope of his duties, then he is absolutely privileged to make those statements regardless of purpose, motive, reasonableness, or reasonableness of the official's conduct, and that's the Liberty Bank case, and that is the law in Washington. And he is privileged in each of those statements. Did he make these statements before he got sued or after? I think all of these statements, well, he's been sued several times, as we know. There's two cases involved, but obviously these statements were made long before, years before, in fact, the lawsuit that took place. Your Honor's brought up the RICO action. I want to address that briefly. The district court properly dismissed the RICO action because Martinet failed to demonstrate that it suffered any injury to a business or property interest recognized under Washington law. I would also add that the secondary reason why Martinet's RICO action should fail or has failed as a matter of law is because it's failed to show any proximate cause between the racketeering activities alleged and the damages that it seeks in this lawsuit. Under Washington law, there is no legally recognized business expectation of being awarded a public contract. I think, as Your Honor's pointed out in your questions to opposing counsel. Furthermore, under Washington law, Martinet can never maintain an action for damages based on irregularities in the bid process. That no damage rule has been the rule of law in Washington for more than 100 years, beginning with the Times publishing case where they indicated that fraud or manifest error, regardless of fraud or manifest error, the only remedy available to a participant in the public procurement process is injunctive relief, and even then, only until the contract is let. That rule of law was affirmed 33 years later in the Bellingham publishing case, and in the Martinet case, it affirmed and in fact cited that same provision that regardless of allegations of fraud or manifest error, damages are never available, only injunctive relief. With that, then, there is no business or property interest under Washington state law supporting a RICO claim. I would also point out that for that exact same reason, the intentional interference and negligence and fraud claims also fail. They can't seek damages for irregularities in the bid procurement process. Just briefly, the proximate cause element also fails because all of the allegations, all the predicate acts of mail and wire fraud in this case occurred after August of 2003, yet the damages that they're claiming for were for design of the 130-car ferry that happened in 1999. Counsel, your time is up. Thank you, Your Honor. Counsel, could you respond to opposing counsel's argument that all of the defamation, the asserted defamation, defamatory statements were privileged? Yes, Your Honor. The one moment, I left the page here. As I stated before, Your Honor, the privilege only applies when the statements are made in the scope of the official duties of the particular executive. Opposing counsel said it's obvious that all of these statements were made in the course of the official duties. Your Honor, what we have here, and I think the two that we've discussed in most detail, in January of 2004, there was an informal lunchtime caucus between members of the Pierce County Legislative Delegation and Defendant McDonald. At that point, we believe he made statements that Martinac was not technically qualified after Martinac had, in fact, been technically qualified by DOT. Understood. A caucus? That doesn't, that word sounds like in the course of his duties right there. It was an informal lunchtime caucus, Your Honor. I don't believe it was an official legislative session. And then we also have Opposing counsel says that it's part of the responsibility of the Secretary to keep legislators informed about the process. So it doesn't matter whether it's informal or formal, that's part of his responsibilities. What's your response? My response is that in this circumstance, when he was saying something that he knew to be provably false, that Martinac was not technically qualified, that was not a fact. It doesn't matter. I mean, because it doesn't matter what his motive is. If he's, if it's privileged, you never get to that if the statement is privileged. I think that's right, Your Honor. I think as you raised this, the question of privilege is an issue that should, should be determined by the district court after Martinac has had a chance to, to depose Mr. McDonald and find out more about those statements. But you would depose on whether it was false or not, right? We would also depose on And that wouldn't matter if all of the other requirements were met. We would also certainly want to know what else was said and when, Your Honor. We want to know the circumstances. Certainly. Whether someone was there, whether or not there were people who were there, who were not entitled to the, to receive the information. What damages are you claiming are attributable to this alleged defamation? Reputational damages to Martinac, certainly. And this issue has been in the news here for quite some time regarding Martinac's issues with the state. Obviously, our damages are pled. We don't, we are not able to prove them until this case goes considerably further. They're still in the ferry business. Martinac still is in the ferry business, Your Honor. But that actually, I'd like to speak a little about the mootness issue because I think I need to clear some things up there. This case is not moot by the passage of Substitute House Bill 2378, which in effect replaced Substitute House Bill 1680. Martinac is not seeking to be awarded a contract under the prior bill. And instead, it's seeking damages for the defendant's actions throughout the entire bid process. Regarding the current status of Substitute House Bill 2378, it's unrealistic that any vessels will ever be built under contracts awarded under that bill. There is currently a contract in place with one of Martinac's competitors, Todd Shipyards. Martinac is a prime subcontractor under that contract. But the DOT has effectively abandoned that contract. The appropriation of funds for that contract have now gone to another project. Engines which were purchased for that contract have also been sent to another project. There's just no realistic possibility that any vessels will be built under that contract. So Martinac doesn't stand to benefit at all from the new bill, and therefore its claims are not moot by the enactment of that bill. Relating to Martinac's damages, opposing counsel noted that Martinac, Martinac's damages go well back before it had any reasonable expectation. Obviously, we feel differently. We feel that the state provided an expectation with respect to the procurement of 130 car ferries early and consistently. But again, this is not an issue for this stage of the case. We were dismissed on 12B6, haven't had a chance to do any discovery, and we will obviously only seek and prove damages that we're able to prove if this case is remanded and we're able to move forward. All right. Thank you, counsel. Thank you, Your Honors. Thank you to both counsels. The case is argued and submitted for decision by the court.
judges: Cudahy, Rawlinson, Callahan